Case number 20-1777, Joshua Atchley et al. versus Astrazeneca UK Limited et al. Mr. Branson, Freddie et al. Mr. Schoenmugel, Freddie et al. Good afternoon, counsel. Mr. Branson, you may proceed when you are ready. Thank you, Judge Pillard. May it please the court, the defendants bribed Jaysh al-Mahdi terrorists both in cash and in kind, and they knew their bribes were funding terrorist attacks in Iraq. That is more than enough to state a claim for primary and secondary liability under the Anti-Terrorism Act. In holding otherwise, the district court misapplied basic Rule 12 standards by ignoring or recasting large portions of the complaint. The defendants now continue the same theme on appeal, repeatedly asserting their version of the facts. But this is a motion to dismiss, and once our very detailed allegations are accepted as true, none of the district court's rulings can stand. The district court erred on four issues I'm hoping to cover this morning, approximate cause, aiding abetting, Hezbollah, and personal jurisdiction. Now, the first two are quite similar, but aiding abetting is actually even easier than proximate cause, because the statute contains no direct link or other causation requirement for secondary liability. And indeed, a recent trilogy of appellate decisions from the Second and Ninth Circuits, Kaplan, Honickman, and Gonzalez, have reversed district courts for misconsidering aiding abetting principles in much the same way that Judge Leon did here. Are you saying that for aiding and abetting liability, a plaintiff doesn't have to prove that the principal who the defendant was aiding and abetting was approximate cause of the injuries? No, Judge Wilkins, I'm not saying that. I should have been more precise in my language when I said there's no causation requirement. I meant that there's no causation requirement that the defendants cause plaintiff's injury. But you're absolutely correct for secondary liability here, Jay Shalmati must have approximately caused plaintiff's injuries. And I don't view that element as being in dispute at this stage. All they have to do is show that they will provide a substantial assistance. So you're distinguishing substantial assistance from the kind of substantial factor that counts for direct liability. That's correct, Judge Tiller. To be clear, we've pleaded both. And I think, as we explained in our error in disposing of the proximate cause issue and the aiding and abetting issue, in that he misconstrued our allegations about the Ministry of Health. But I do agree, Judge Tiller, that substantial assistance, and you can just see this from the court's Halberstam opinion, I don't think most people would say Linda Hamilton proximately caused the murder, and yet she was held liable for it. And so I do think the analysis is even easier for aiding and abetting. And I would submit that that is the most straightforward path to reversal here. That said, oh, I'm sorry, Judge Tiller, if we can ask a question. You're getting there. So to move to approximate cause, as I said, I think that Judge Leon made a fundamental error in disposing of both our primary and secondary liability claims. And I really just have three points about that. First is the ministry was a known terrorist front, not an independent intermediary. It was, in the words of US Embassy Baghdad, quote, openly under the control of the Mahdi Army of Muqtada al-Sadr. That's paragraph 169 of the complaint. Once that allegation is accepted as true, this decision should be reversed. Terrorist-controlled intermediaries do not defeat causation, and they certainly do not preclude aiding and abetting liability. So you're making a very important distinction between a state sponsor of terrorism and a nomenclature, they may sound similar, a state sponsor of terrorism is a government, a nation state that harbors in some way terrorists or doesn't go after them. Whereas here, you're saying, no, no, no, that Judge Leon made a false equation between a governmental agency and a nation state. Judge Tiller, that's absolutely correct. And I think this court's decision makes that plain in that nobody claimed that al-Qaeda was running the government of Sudan. Sudan was not an instrument of al-Qaeda. Did it support al-Qaeda? It absolutely did. But I think the point of Owens IV was that because Sudan was an independent intermediary, and again, that was this court's words, it severed the link between there, the bank, and al-Qaeda. And we have pleaded the opposite of that. We pleaded that the Ministry of Health was not an independent intermediary at all. I would also want to emphasize another key distinction with Owens IV on that front, which is their, BNP's money never got to al-Qaeda. And that's true of every intermediary case the defendant cites. Owens IV, Rothstein, Kemper, Brill, Siegel, all of them, the bank's money doesn't get to the terrorist group. It stops with the intermediary. Here, Judge Leon himself recognized that we have pleaded exactly what was missing in Owens IV, in that the defendant's free goods payments financed Jaysh al-Mahdi, not any legitimate Iraqi health program. And that's most apparent at JA 835, where in Judge Leon's words, defendants were aware that their goods, quote, would be used by Jaysh al-Mahdi to support terrorist attacks, close quote. That is the sort of substantial connection to terrorism that Owens IV held would be sufficient. The plaintiffs in Owens IV did not meet that test. We do. The third point is the cash bribes. I want to pause here because these are very important. Defendants paid individual cash bribes to the terrorist operatives who were at the ministry. And no matter what this court thinks about the status of the ministry as a juridical institution, the point of a bribe is that it goes to the individual, not the institution. That's what makes it a bribe. And so I don't think anybody is disputing that if those bribes were paid, it would violate the statute. All that's disputed is whether we've properly pleaded them. And as we've explained in our papers, our many pages of allegations about these bribes more than satisfy our pleading burden under Twombly and Iqbal. I'm trying to understand how you think that the scope of the liability works. Let's suppose we send your case back and let's suppose that the fact finder does not believe that you've proven the bribes. And all that the fact finder finds is that the defendants did business with Jay Shalman or with the health ministry. Because with the health ministry, I'll say, is that sufficient in your view for liability? Because if they did business even without paying bribes or providing extra goods that could be on the illegal market, that's material support because of the, I guess, the unity between Jay Shalman and the ministry of health? Yes, Judge Wilkins, we do think that. We've alleged that at paragraph 179 of the complaint. We don't think we need to prove the bribes in this case. I think you can see that most clearly. The analogy would be the Ninth Circuit's Gonzales case where Google didn't do anything special or illegal to support ISIS. It just had a commercial business relationship and the Ninth Circuit reversed the dismissal of aiding and abetting claims. So yes, Judge Wilkins, the answer is yes. That said, I think this case involves quite a lot more than that and the bribes are our lead theory, I would say. And the reason is the Special Inspector General for Iraq Reconstruction called. So if you're right, then the U.S. government provided substantial assistance under your reading of the statute, right? I don't think so, Judge Wilkins. I don't think the U.S. government did business with the ministry in the way that you're positing. Certainly, the U.S. government built infrastructure projects. It tried its best to clean up the ministry. It attempted to wrest control of the ministry back from Jaysh al-Mahdi through things like the arrest of Hakim Zamali, who was the Deputy Health Minister, who in General Petraeus' words had, quote, effectively hijacked the ministry. General Odierno ordered a military operation in June 2007 called Operation Black Crescent that was attempting to address this problem, AMF at JA 794. So no, I know, Judge Wilkins, the defendants say that a lot in their brief. There's no question. But there's no evidence of that. And more importantly, we don't allege anything that would support that inference in our complaint. If you look at paragraphs 76 and 113 of the complaint, we allege that the U.S. government did not support the Jaysh al-Mahdi-controlled ministry, did things like build hospitals while trying to clean the ministry up. And this goes to a very important point that even Judge Leon accepted at JA 824, where he acknowledged that taking our allegations is true. What the defendants did was counterproductive to the U.S. mission to improve the Iraqi health system. So this notion that the defendants are trying to argue on a motion to dismiss, that they are hand in glove with the U.S. government is just not true. And it's certainly not alleged in the complaint. On the on the direct liability, the district court only reached proximate cause and actually only reached the independent intermediary block to a showing approximate cause and didn't actually even go further and consider whether, where, I mean, even if there is an independent intermediary, as we know, there can nonetheless be liability if there's a sufficiently, I'm going to get the words wrong, but if there's sufficiently substantial showing of aid nonetheless. But the district court did not go on to look at the reasonable foreseeability aspect of the public cause information, nor did it consider the act of international terrorism aspect. And in the act of international terrorism, am I correct that here the allegations are that the acts of international terrorism are material support for terrorists and terrorist funding under 2339 A and C? That's correct. And am I correct that the statutes that 2333 A requires such an act, but that additionally, the defendants have violated such law in a manner that appears to be intended to intimidate or coerce a civilian or influence policy of a government or that, that's a overlay on the incorporated act of terrorism. Is that correct? That's correct. Okay. And is there precedent that recognizes 2339 A and 2339 C as qualifying acts of international terrorism? Yes, Judge Pillard, the Bowen case from the seventh circuit involved 2339 A. So there is precedent for that. There's some district court cases that have recognized 2339 C. I don't believe that particular issue has made its way to an appellate court. And in terms of the appears to be intended to, that is a legal question. There is a complaint before us. Are you asking us to reach that? Are you asking us to remand? If we were to agree with you, I'm just trying to get the scope of your presentation. If we were to agree with you that the dismissal based on a lack of probable cause might need further thought, should we reach or should we not reach the act of international terrorism? I'm hesitant to give the court advice about what it wants to reach. I certainly don't think it has to reach the question. This was not, because of the posture of how we brief this, I would say the briefing is rather sparse before this court because it was an alternative argument. I think it would be a this court does have discretion to decide if it wants to. But I suppose if you were to ask my views, it would be to remand because Judge Leon did not reach this question and it has not been, I would say, briefed as thoroughly as the other issues in the case. That said, I do think the Bowen case that we cited provides some very good precedent for our theory, which is that courts typically presume that people intend the natural consequences of their actions. True enough, but when you're giving directly to, was it Holy Land Foundation, that looks a little bit more like the US donors possibly being on board with the mission of the ultimate terrorist group than giving medical, than contracting for medical goods with even a defunct and hollowed out Ministry of Health in Iraq. Well, I disagree, Judge Pillard. I don't think that inference you just drew was within the opinion. If you read the district court opinion in the Bowen case, which I would encourage you to do, this was not cash given directly to Hamas. The defendants claimed that it was, but that's not what happened. It went to a variety of charities that did legitimate charitable things like social welfare services. With Holy Land Foundation, I guess is in the caption. That's right. Holy Land Foundation was a defendant, but if you read the district court case, they were not giving money directly to Hamas. They were funneling it through, I think, a list of about 10 charities. And not all of them were even controlled by Hamas. Some of them just were independently aligned with Hamas. So I would say that our allegations are stronger than the ones in Bowen. And the reason that my friend's cases are off point is they've cited cases like Kemper and Brill, where there was no proximate causation. So this theory that we're articulating didn't work for those plaintiffs because the natural consequence of their actions did not include terrorism. So if this court were to reach it, I think the comparison to Bowen is good. I would also encourage the court to look at Judge Lamberth's opinion in the Woltz versus Bank of China case. A very, I would say, somewhat comparable fact pattern, where the defendant made all the same arguments that we're a reputable bank. We could never intend to cause terrorism. And Judge Lamberth applied the principles I just articulated and denied the motion to dismiss. And I think the same result should obtain here. On your ending and abetting, I'm sure you're getting there. I wonder if you could talk to us about Desi's terrorist organization Hezbollah's role in committing, planning, or authorizing Hezbollah. Authorizing, thank you. I think it's an excellent question. That's exactly where I was going next. And I think the important point was built into your question, which is that Congress did not limit secondary liability to terrorist acts committed by a designated FTO. Instead, it extended liability to acts that are planned and authorized by an FTO. And the reason was to cover attacks committed by a terrorist proxy group of a designated organization, like Jaysh al-Mahdi was for Hezbollah. Jaysh al-Mahdi was an instrument through which Hezbollah orchestrated terrorist attacks against Americans in Iraq. And on that issue, I would encourage the court to read the amicus brief by the commanders signed by General George Casey and many of the other top generals from Operation Iraqi Freedom, explaining how deeply Hezbollah was involved in Jaysh al-Mahdi's terrorist operations and why the district court's logic misapprehends the way these groups work in practice. So I don't view Hezbollah's role as really being disputed here. I think the only question is whether it was sufficiently linked to each individual attack. Right, the defendants really push you on, you know, it's not enough to train, it's not enough to inspire. That's just very general. And the way they read the statute, and it's a natural enough reading, that planning and authorizing is a much more event-specific verb. Well, that may be true, Judge Pillard, but we have tied the training and the planning and provision of munitions to our individual attacks. I think that's really not even contested. The easiest place to see this is for explosively formed penetrators. It's paragraphs 395 and 96 of the complaint, where this was a Hezbollah signature weapon, and Hezbollah was involved in every single penetrator attack in Iraq. And so, you know, Judge Pillard, I suppose one reading of the statute that I guess I understand my colleagues to be advocating for is that you have to plead that a Hezbollah individual operative showed up to the street corner where the attack took place and have to point, hey, Jaysh al-Mahdi, plant this IED here, and I want you to blow up that Humvee. And anything less than that is not planning or authorizing. I think that's textually unfounded, as we've explained in our brief. Planning and authorizing does not require control of all of the details. But I think it's also inconsistent with the way these groups work. And again, I thought the amicus brief from the commanders was quite compelling on this, that that's not how Hezbollah orchestrates attacks. It doesn't send Ali Musa Daqduq, its commander in Iraq, to the street corner in Sadr City and plant an individual IED. It orchestrates the infrastructure through which Jaysh al-Mahdi then commits these attacks. And for every attack alleged in the complaint, we've alleged a tactical and a geographic nexus tying Hezbollah to the individual attack. And on a motion to dismiss, that's not... But you're kind of doing this backwards. You're saying that we have to interpret the statute so that it comports with how terrorist organizations work. No, we have to interpret the statute and we see whether the way that you have alleged that this works fits within the statute. That's true enough, Judge Wilkins, but I think we've done that. I mean, my colleagues, it's not like they define the word planning and authorizing. This excludes the theory I've articulated. A person, just the ordinary meaning of the word planned, you plan an attack if you, for example, the example we gave in our opening brief, if a Hezbollah operative trains a room full of Jaysh al-Mahdi fighters how to use 107 millimeter rockets against Americans in Iraq, and does so with the specific intent to cause Jaysh al-Mahdi then to commit those attacks using those rockets. Hezbollah has planned those attacks, whether or not the Hezbollah operative then shows up to the street corner and says, now I want you to employ what I taught you and go blow up this particular target. Just the... Sorry, Judge Wilkins. So if I train my law clerks on how to write briefs and how to make arguments, am I planning their future briefs and arguments? I think arguably you are, Judge Wilkins, but this case is even, I think, easier than that because their specific intent. And that is a critical facet of our allegations. Hezbollah didn't just train Jaysh al-Mahdi because it wanted Jaysh al-Mahdi just to be good terrorists in the abstract. It did so for the particular purpose of orchestrating terrorist attacks against Americans in Iraq. It actually doesn't require that, or are you reading plan an authorized... I guess authorized does, but what about plan? Are you reading plan in a manner that would require some proof of intent on the part of Hezbollah? I think I am, Judge Pillard. I think when you plan an act, you have to have intent for the act to take place. And the fact... Our allegations that Hezbollah wanted these attacks to take place, that's not disputed here, and I'm not anticipating any difficulty proving that if the case were to be remanded. But I do think it distinguishes it from a lot of the hypotheticals you can think of, where if all Hezbollah had done was given a small cash donation to Jaysh al-Mahdi and said, I want you to have this because we support Muqtada al-Sadr's mission of allegedly providing care to Iraqi Shia, that wouldn't be enough. But I think that the tight nexus between what Hezbollah has done and each attack here really distinguishes it from the other hypotheticals that have been given. And in the commander's brief, they have cited district court cases from judges in this district that have made evidentiary findings about Hezbollah's role in an individual attack based on little more than the weapon type and the geography in which it was used. So I actually think that we're going to have experts and we'll be able to prove that even without any other that's the acronym for the penetrators that went off in Sadr City, Hezbollah was involved in that. And at a motion to dismiss to require us to plead more, Judge Wilkins, to your point about does the reality of terrorism affect the statute? I think it does because Congress stated that its purpose in enacting the Justice Against Sponsors of Terrorism Act was to provide the broadest basis to afford relief against companies that finance terrorists directly or indirectly. And under their view of the statute, I think this cramped FTO requirement that they're adopting would gut Congress's purpose. And that absolutely is something that this court should consider. So just to review on the aiding and abetting, the state of mind requirement is different from the liability. Providing substantial assistance? I think the Second Circuit Judge Tillard has actually cleaned this up quite a bit in the Kaplan and the Honokin cases. For aiding and abetting liability, I think the state of mind requirement is general awareness. And as the Kaplan case explained, that's actually less than fully focused knowledge. Linda Hamilton did not even know about the murder for which she was held liable. She didn't even know that Bernard Welch was committing murder. So it's general awareness of the defendant's role in an illegal activity from which terrorism was a foreseeable risk. That is the standard the Second Circuit has adopted, and I think it's correct. Now, you're correct that the state of mind factor for substantial assistance, Judge Tillard, I think the degree of knowledge is relevant to that inquiry. But what Judge Leon held was actually the standard is specific intent. The defendant has to be one in spirit with the terrorists, and that's just not right. That's not anywhere in the statute. It's inconsistent with aiding and abetting doctrine, and the Second and the Ninth Circuits have now rejected it. And the Ninth Circuit in Gonzales actually reversed the district court case that Judge Leon cited for that requirement. So I think degree of knowledge is one of the factors, and I don't think it's seriously contested here. Judge Leon acknowledged that these defendants knew, but it's certainly not specific intent, and I think it's very important for the court to reject that standard. You have these two theories, two separate counts on aiding and abetting. One is the RICO count, and the other is the more direct authorization. If we were to believe that Judge Leon erred with respect to dismissing one, do we need to reach the other? Do we need to reach both? I think you do, Judge Pillard, because there are separate counts, and Judge Leon dismissed both, so I do think you need to reach the RICO count. And if I can address that just briefly, it all depends on what does the word act mean. Can the word act encompass a multi-year terrorist campaign? I think Judge Wald's opinion in Halberstam answers that question. The court there defined the act assisted, that is the court's words, as the multi-year burglary campaign. We know Congress wanted Halberstam to provide the legal framework for how aiding and abetting liability should function, and that's an argument I think you'll find conspicuously missing from the district court opinion and from my friend's brief. Why do you even need RICO? I mean, in a way, it seems like it's almost a factual question. As you say, there's no RICO claim in Halberstam. Why isn't it just either the a whole campaign in more common-sense problems? Somehow, I mean, you know, RICO is a hornet's nest. That's technical terminology. And so I just wonder, is RICO as such doing any work for you? Well, the reason we cited RICO is because, Judge Pillard, as you noted, I think in your questions earlier, there needs to be a predicate criminal violation of U.S. criminal law for the definition of the act of international terrorism. And so we defined RICO, and I realize RICO can scare some people off. There have been a lot of bad RICO cases that have been brought in history. But we're not claiming the defendants violated civil RICO. What we're claiming is that Muqtada al-Sadr's terrorist enterprise was a RICO violation, and that is what the defendants aided under count two. And in terms of whether RICO's predicates have been met, that issue is not on appeal before this court. I think you treat that as true. And so really the only question is, can a multi-year campaign be an act in the context of this statute? And, you know, we've explained why in our brief we think it can, but again, I think Halberstam provides the answer. Judge Pillard, I think your question is a clever one, and I think you can also incorporate this concept into count one for the reasons you described, that this is a factual question. And you'll find some support for that in the Second Circuit's Kaplan decision and in the Ninth Circuit's Gonzalez decision, which both took care to define the act assisted, the principal violation, not as the individual bomb going off that injured the that the defendants aided. And so I think those cases also provide some ammunition, Judge Pillard, to write the opinion in the way you were just suggesting, if you were inclined to go down that route. If act of terrorism is defined that broadly and planned is defined broadly to include basically training, which is the way that it appears that you're arguing this, then it would appear that even in circumstances where kind of the FTO is kind of in the background, maybe years in the past involved in training someone who goes out and commits an act of terrorism. And even if that's not really very apparent or publicly known, there's going to be aiding and abetting liability. Well, Judge Wilkins, I think there's got to be some sort of a nexus between the training and the attack. So, for example, we don't plead any of these claims, but let's say there was a suicide bombing in Iraq that Jay Sharmati conducted to blow up an American. Hezbollah training them how to use penetrators doesn't have a nexus to that attack. So I don't think that would constitute planning. But the other point that I think should address your concern, Judge Wilkins, is go back to my specific intent point, that the FTO has to be doing it for the purpose of causing the type of terrorist attacks at issue. And I think that's been pleaded here in spades. And, you know, Judge Wilkins, to your question about whether it's publicly known or not the FTO's role, that's not an element of the statute. There's no suggestion that a defendant has to be aware of the FTO's role. It's just they have to be aware that they're assisting a person, a terrorist group, that's committing acts of international terrorism. And, you know, to give you, Judge Wilkins, an example of something that's outside the line, look at the only case that my colleagues and Judge Leon cited, the Sixth Circuit case from Crosby versus Twitter case. That was a lone wolf shooter that shot up a nightclub in Orlando, Florida, the Pulse nightclub, never had any contact with ISIS, wasn't part of ISIS. ISIS didn't train him, didn't give him anything, didn't authorize the attack, didn't say anything to legitimize it. That's an example of something that our theory of the statute would still rule out. But I would encourage the court not to treat the planning and authorizing element as though Congress intended that to substantially circumscribe the scope of the statute. There's no textual or structural evidence that that's the case. And if you look at Congress's declaration of purpose in the Justice Against Sponsors of Terrorism Act, there's no reference to foreign terrorist organizations and the Congress has declared that its purpose is for this to sweep broadly. So, you know, the fact that this might cover lots of terrorist attacks, that's a feature not above of our interpretation. Because remember, a defendant is only liable if they aid and abet the terrorist group. And if they're generally aware that by doing so, they're playing a role in illegal activity from which terrorism is a foreseeable risk. I missed what you just said. You said there's nothing in the JASTA reports or whatever saying referring to foreign terrorist organizations, but in the text, there's a requirement that the act be committed, planned, authorized by a foreign terrorist organization. It's striking that even though aiding and abetting is typically easier to meet in this statute, the aiding and abetting provision has this requirement that's not in the direct liability part. So it does feel like it is a narrowing or you know, boundary setting provision. There's no question it's boundary setting and I'm not but I was attempting to address Judge Wilkinson's specific point, which is when you're interpreting the words planning and authorizing, which I submit are very broad words, the court should not be thinking about this from the perspective of we have to really narrow this to a very limited set of attacks. That is not, there's no evidence that that's what Congress wanted this limitation to do. I would submit that what Congress wanted this limitation to do would be to rule out the lone wolf shooter type situation, the Crosby case that the defendant cite. And so you're absolutely right, Judge Pillard, I'm not suggesting read the element out of the statute. It's an element we have to meet it. But you know, these words on their own, it's not as though my friends on the other side or Judge Leon defined the word plan and authorize in a way that limit out our attacks. I mean, we've defined the words, we basically all agree on what they mean. The question is just how do you apply them to terrorism? And I would suggest, in light of the statute's purpose, that if there's any question about that, the court should not be looking to limit this to attacks that are that actually look like they're committed by a foreign terrorist organization, because that would be atextual. And I think that would do violence to Congress's purpose as you know, again, not to beat a dead horse, but as I think very persuasively explained in the commander's amicus brief. I'm sorry, I know we've kept you a long time, but I'd appreciate it if you could address personal jurisdiction over the foreign defendants. Thank you, Judge Pillard. The foreign defendants purposely availed themselves of the United States by sourcing US drugs, by working with their US affiliates, by procuring US documentation, and by certifying the US origin to their terrorist counterparties. I think there's no question in this posture that that constitutes meaningful jurisdictional contacts. The question before this court is whether they are sufficiently suit-related to support specific jurisdiction. And after the Supreme Court's decision in Ford this year, I think that case confirms that that test has been met. We know right out of the gate that Judge Leon applied the wrong legal standards. This is at JA 819, where he said that for contacts to be suit-related, the contacts need to be such that would expose the defendants to liability under the Antiterrorism Act. We know that's not correct now after Ford. A contact does not need to be tortious. It does not even need to be causally related to the claims in order to qualify. I think the question under Ford is whether the contacts demonstrate a meaningful affiliation between the forum and the controversy. And I think certainly in this procedural posture, taking our allegations as true, we have more than satisfied that burden. And I'll just make three points on that if I could. The first is that the US sourcing was not a coincidence. I know my friends in their brief repeatedly characterize it as happenstance or kind of accidental. That's not what we alleged. The complaint alleges in detail for every defendant that the sourcing was a deliberate choice designed to be able to obtain these contracts in the first place and to magnify the value of the bribes being delivered to Jay Shalmati. So that's the first point. The second point is that they were working with their US affiliates. The way these transactions worked is that it's not as though the foreign defendants in isolation handled the contract with no interaction with their US affiliates. We've alleged for every defendant that there were these what we call cross-functional teams where the US manufacturer and the foreign supplier worked in concert to fulfill these orders. And that is very much suit-related conduct. And then the third point is- Was that alleged for all of the manufacturer defendants as opposed to the supplier defendants? Yes, Judge Wilkins, it was. So the manufacturer defendants, just to be clear, those are all American companies. So the manufacturer defendants, there's not a jurisdictional question pending before this court, I suppose, other than the pendant jurisdiction question for state law that I think my friends and I agree on. But the manufacturer defendants are US companies, and they are not raising the personal jurisdiction challenge. So we're only talking about supplier defendants. And for the supplier defendants, yes, the answer is yes, we've alleged it for every defendant that they worked with their US affiliates. And I think, Judge Wilkins, that's a good one, because it brings me to my next point, which is at a minimum, we should be entitled to jurisdictional discovery. This court has made clear many times, most recently in the Urquhart-Bradley case, that where the plaintiffs can show they may be able to supplement their jurisdictional facts, the court should liberally grant jurisdictional discovery. And we asked for that before Judge Leon. He did not respond. And you want contracts? What is it that you want for jurisdictional discovery? We want contracts, and we want the contract-related documents that go to this question. All of the factual inferences that are being debated in the personal jurisdiction section, we want discovery on. So for example, how material was the US sourcing to the contracts? That is a question that I think discovery could answer. Did the foreign suppliers, to Judge Wilkins' question, did they, in fact, cooperate with their US affiliate manufacturers in fulfilling the contracts? We would want discovery on that as well. And just as a very basic matter, we want to see all the contracts themselves. One of the problems with what Judge Leon found was that some of the defendants, you know, GE Healthcare, submitted no evidence whatsoever. Roche, to take another example, we alleged four contracts in the complaint. They submitted a declaration attaching two of the four and said nothing about the other two. Yet, Judge Leon, with this factual record, drew sweeping factual inferences, in my view, about whether the US sourcing was or wasn't material. I would submit you can't even start to answer that question until we have all of the contracts. And your theory that it was material, and when you talk about the connection to the tort, is, as you said, that it was, it enhanced the value of the goods, it increased the ability of the defendants to get the contracts. What other meaningful affiliations are you referring to? Judge Pillard, I think those are the most important two. I would add a third, which is that the bribes were then, were given in violation of a US federal statute and injured American citizens who felt injury in this forum. And I think that is a very relevant question that goes to the affiliation between the forum. And that's FCPA? And what's the status of those cases? Well, I'm sorry, it's not an FCPA issue, Your Honor. I was referring to the Anti-Terrorism Act, that Congress, in Section 2A6 of the Justice Against Sponsors of Terrorism Act, made a finding that these types of cases are vital to US national security. And so I think, you know, of course, my friends say that's all irrelevant, because that's just Congress trying to wish away a constitutional provision. But that's not true. I think if you read forward, you'll see the Supreme Court placed quite a lot of weight on Montana's interest in hearing the controversy. And I would submit, you are rarely going to find a civil lawsuit in which the forum's interest is stronger than in this one. Now, Judge Pillard, you asked me, I think, about the status of the FCPA criminal investigation. I believe that's what you're asking. I don't have a lot of visibility into that. I don't know. I know the defendants said that it's been closed. What I can tell you is my understanding is that the the key time period of our case, 2004 to 2008, was outside of the limitations period that I believe DOJ was working with under the FCPA. I think they might have had, there may have been issues with the beyond a reasonable doubt evidentiary standard. There may have been issues of prosecutorial resources. I just don't know. But what I do know is that Congress intended the Anti-Terrorism Act to provide a supplement to criminal enforcement. And, you know, whatever DOJ may or may not have decided about these allegations, I think should have no bearing on this court's decision about whether we have pleaded a cause of action under the Anti-Terrorism Act. To the extent that your theory relies on notions of agency as between manufacturing defendants and supplier defendants, or even in Iraq, what law do we look to? Do you cite the restatement? Isn't there a complicated choice of law question there? I would submit it's U.S. law because this claim arises under the Anti-Terrorism Act. So I cited the restatement because I thought general U.S. common law principles provide the best answer to that. Judge Pillard, to go back to one of your earlier questions, I can confidently say I think this one is not a question the court should reach in this posture. My friends devoted literally a half of a sentence to it in their brief. And, you know, if the court actually wanted to hear argument about whether the suppliers were agents of the manufacturers, we would have a lot to say. I don't really think that's a question the court should reach. But if you are inclined to do it, I would submit U.S. law is the place to look. I see I am very far over my time. So, of course, I'm happy to answer any other questions. But otherwise, I'm happy to rest. My colleagues have questions for Mr. Branson? No. Thank you. We did go over your time, but we will give you some a short amount of time for rebuttal. Thank you. Thank you, Judge Pillard, and may it please the court. Taking plaintiff's allegations is true. The district court correctly dismissed the complaint for failure to state a claim. At the request of the United States government, defendants stepped forward to help rebuild Iraq's nationalized health care system after years of neglect. Defendants manufactured or supplied life-saving  at a time when the United States government and many others were providing similar support. Yet plaintiffs in this case allege that by providing their goods to the ministry, defendants were knowingly supporting armed attacks on American soldiers by the Mahdi Army, which stole those goods from the ministry. Plaintiffs have failed to state a valid claim for direct or aiding and abetting liability under the Anti-Terrorism Act. And they cannot cite any case permitting an ATA claim to proceed on even remotely similar facts. As to direct liability, plaintiffs' claims fail first because defendants' transactions with a legitimate sovereign ministry do not establish proximate causation under this court's decision in Owens 4. And second, because the supply of medical goods does not constitute a violent terrorist act, in the words of the statute, an act of international terrorism. And as to aiding and abetting liability, plaintiffs' claims fail first because defendants did not provide substantial assistance to the Mahdi Army. And second, because defendants were not aware of their role in terrorist activities. In addition, plaintiffs' claims are barred by the Statutory Act of War Exclusion, and they cannot establish personal jurisdiction over the foreign defendants. A contrary decision would have a severe chilling effect on the willingness of companies and non-governmental organizations to conduct essential activities, often at the government's request, in troubled regions. The district court correctly dismissed plaintiffs' complaints, and its judgment should be affirmed. Now, I'd like to start, if I may, with direct liability, and then proceed to aiding and abetting liability. As I mentioned, there are really two issues here, proximate causation and the requirement that there be an act of international terrorism. On proximate causation, I think our submission is quite straightforward. Under this court's decision in Owens IV, which is consistent with the law of numerous other circuits, the presence of a legitimate sovereign intermediary breaks the causal chain. And the real relevant question for purposes of this analysis is whether that government entity was performing legitimate sovereign functions. Now, in this case, there's really no dispute that that is true, and we know that from the allegations of plaintiff's own complaint. In paragraphs 2 and 72 of the complaint, which can be found at pages 97 and 121 of the joint appendix, plaintiffs alleged that the Ministry of Health was responsible for administering Iraq's system of simply acting as a front for a terrorist organization. Under Owens IV, even if you have an independent intermediary, that just raises the need for a robust showing of proximate cause. It doesn't give an immunity any time you have an entity that might have some legitimate function. Isn't that right? And the district court didn't go on to analyze that, but did just treat the governmental character of the Ministry of Health as a block to any finding of proximate cause. Isn't even just that under the terms of Owens IV incomplete? Judge Pillard, I think it's fair to say that the court in Owens IV left the door slightly ajar. The court said that where the intermediary is a sovereign state, the need for additional allegations supporting substantiality, a substantial connection, is all the more acute. And our fundamental submission, and I think this is a fair reading of Judge Leon's order, is that the allegations here are simply insufficient to meet that high bar. We simply don't think that the allegations in the complaint match up to this characterization of the ministry as acting simply as a front or alias for Jaish-e-Mahdi. At most, the complaint alleges that affiliates of Jaish-e-Mahdi infiltrated the ministry, that some of the officials in the ministry were acting as agents of Jaish-e-Mahdi, and the Jaish-e-Mahdi, or the Mahdi army, was certainly using the ministry as an instrument in some instances to commit terrorist acts. We take all of that as true, but our fundamental submission is that that is not enough to make this like a case where you have, say, a charity that is acting as a front for Hamas or Hezbollah. This is a very different situation from those in which you have a nation-state that is the independent intermediary, and that's, I guess, Owens IV, Kaplan, you know, where that I think your brief is leaning on, where it's a nation-state, it's a government of an entire country, and the notion that some, you know, that by being a state sponsor of terrorism, it is somehow equated with the terrorists that it supports, that seems to me a much more challenging obstacle to a finding of probable cause than, as alleged here, there is, even if you don't believe, a full takeover, and that there's some, you know, provision of health care to people who are not anathema to the to the jam-affiliated folks who control the ministry. So they may be providing some legitimate health care, but this is quite different from the cases on which Judge Leon relied in the sense that, as alleged, there's a major, major sort of terrorist function that's sponsored. So I just, are there other cases or other ways that you can help us think about why, nonetheless, the agency character of the Ministry of Health should prevent a finding of approximate cause? Is that the only holding, really, that Judge Leon made? Judge Pillard, I would flip that around and respectfully submit that, if anything, this case is a weaker case for the reasons you identified, and let me explain why that is so. You are certainly right to note that in the other court of appeals cases that address this issue, the intermediary is typically one that has been designated as a state sponsor of terrorism, and indeed, in many of those cases, you have defendants who are actually evading sanctions regimes in order to transact with those foreign intermediaries, and yet courts have still said that that is insufficient. By contrast here, you have a government ministry, and there's no dispute that it's a cabinet-level ministry within a sovereign government, but it's one that is actually being supported by the United States government during the relevant time period, and I would note parenthetically, because my friend, Mr. Branson, at argument, as in his brief, sort of strains to say that the United States government was somehow not supporting the ministry during this time period. I think that the allegation in paragraph 113 suggests otherwise, and to the extent that Mr. Branson is trying to insinuate that the United States government was dealing, you know, only through other means, that it was not transacting with the ministry, I do think that that is belied by the government reports on which we rely at page 31 of our brief, and on which this court certainly can take judicial notice, that indicate the United States government was providing millions of dollars of support to the ministry and encouraging the which was that the United States government in the immediate period after the fall of Saddam, Saddam Hussein, was attempting to once again stand up the Iraqi healthcare system, but leaving all that aside, Judge Pillard, even if you disagree with everything that I've just said, you're left with the fundamental problem that Judge Wilkins identified in his colloquy with my friend, which is that if you think that the plaintiffs here have sufficiently alleged that the ministry was somehow a front for, or an alias, or an agent of the Mahdi army, you're left with the fundamental problem that the illogical consequence of that would be that the United States government and anyone else, the United Nations, whoever else, who dealt with the ministry, would somehow be responsible for proximately causing these attacks on American service members. Now, I think in an effort to avoid that implication, what plaintiffs are trying to do is to suggest, well, this is because the supplier defendants here somehow structured their transactions in a way to provide free goods to the ministry or bribes to Mahdi army terrorists. Now, you know, I would vigorously dispute the characterization that the allegations here support corruption. And indeed, as Mr. Branson acknowledges, and as we point out at footnote two, to the extent that the Justice Department was investigating those allegations, it has indicated that it does not intend to go forward with any further investigation. But leaving all of that aside, this is not an FCPA case. The question here is not whether corruption was taking place, or even whether defendants knew that corruption was taking place. Well, under Halberstam, though, it seems actually that our circuit has viewed, you know, other illegality as relevant to the question, at least of aiding and abetting. I mean, in a way that on reading might even seem somewhat shocking that, you know, knowing about someone's apparent burglary makes you liable for murder. You know, Yeah, and Judge Pillard, I want to be very clear about how I'm signposting the issues here, because they are obviously discreet. I think that goes to the issue of state of mind, both as an element of substantial assistance, and also as a standalone requirement for aiding and abetting liability. My point here is simply that, that to the extent that plaintiffs are attempting to rely on these allegations of corruption, as an effort to sort of get around the fundamental problem with their corruption theory, it just doesn't work here because there are insufficient allegations that this is a case where what was taking place was that defendants were somehow supporting Jai Shalmati directly. I want to say just a word about the allegations and the complaint, because this is such a central part of plaintiffs argument. With regard to the free goods, the complaint, actually at numerous points, alleges that the free goods weren't even distinguished from other goods. And so, you know, it's a little bit unclear exactly how the plaintiffs can allege that the free goods somehow were going directly to Jam and were bypassing the ministry. Indeed, the complaint itself alleges that this was actually a common practice, that to this day, it still appears on the standard bid instructions. And as we explained in our brief, it's a common practice more generally as a way simply of providing a discount from the reference price for drugs that are being provided. Although they would dispute that a discount from the reference price is something that's quite different and doesn't facilitate the evasion of inventory controls, such to the extent that there were any, you know, that that's a different move on the part of defendants. To the extent that that's true, though, I think the plaintiffs still have the problem that in paragraphs 120 and 123, and I would note that the complaint is no model of clarity on this point, but at various points, the complaint suggests that the free goods were not being distinguished from other goods. And so to the extent that what plaintiffs are trying to do is to suggest that somehow free goods are going directly to Jam, I don't think their allegations get there. But I want to really focus... Well, in a way, just reading into the, you know, the light most favorable to the plaintiff, I take them to be saying they're packaged all together, they arrived in a way that doesn't, you know, that they travel in a way that doesn't single some out. In fact, on their telling, Darshan Mahdi has free play on the receiving end and can sell even things that doctors have said they need, sell them on the black market. But it's really, I think, a way for them of saying, you know, maybe we would have a case if only the amount ordered were being sent because the defendants knew or should have known that this was not a Ministry of Health, but a terrorist hotbed. But at least where they are sweetening the pot and sending goods that aren't, you know, they're over and above, they're basically engaging in bribery of bad actors who they know will use that money for burial. Well, a further problem with that, Judge Pillard, is that I really don't hear plaintiffs to dispute that their whole theory here is that these goods were being provided to the ministry. And then at that point, they were being looted or stolen or whatever verb you want to use by ministry employees who, in their view, were typically jam agents. And that just underscores the fundamental causal problem with their theory. And before we get off this subject entirely, I do want to specifically address the allegations concerning bribes, because that was where my friend, Mr. Branson, started with his very first sentence. And those are obviously, you know, the most lurid allegations in this complaint. And I think Judge Leon correctly found... Oh, I don't know. I think there's some other allegations that have a higher claim to being lurid. But go ahead. But can I say one thing about these so-called bribes, which is that Judge Leon, I think, correctly determined that there were simply insufficient allegations of that. And the one specific example to which plaintiffs point are these transactions by GE Healthcare, which plaintiffs rely on both in their opening brief and in their reply brief, these so-called $6 and $10 million bribes. I would invite the court to look at the relevant paragraphs of the complaint, and particularly paragraph 214 of Joint Appendix 188. The complaint does not allege a $10 million bribe. It alleges that there was a contract worth $10 million that, quote, caught the eye of investigators and that the contract was linked to GE, quote, on information and belief. And I think that there are sort of analogous deficiencies with the allegation concerning the $6 million bribe. But I think that in fact, if you look at that paragraph, it's not alleging a $10 million bribe. It's actually quoting a source saying, Dr. Zabili saying that Dr. Adel took a $6 million bribe from a foreign company. All right. I mean, it's just, that's just what it says. Yes. On contracts that one confidential witness understood to concern GE Healthcare. And so there, I'm not disputing- But there is an allegation of a $6 million bribe from a foreign company. Correct. Correct. But I think- Pretty straight up. But I think that the link to GE Healthcare there is fairly spare. And again, I make the point simply to sort of underscore, and the overarching point with regard to the so-called bribes, Judge Pillard, is that there's no dispute here that the complaint itself, and this is in paragraph 145, but also in paragraph 142, alleges that payments were made to Ministry of Health officials who are at most also members of JAM. There's no suggestion that payments are going directly to JAM. Now, I don't want to consume the entirety of our time on this one issue, but I'm content to sort of rest on the possibility that there might be sufficient allegations in a case involving a sovereign intermediary. Our fundamental submission is that these allegations simply don't meet that high bar. Now, I do want to turn to the act of international terrorism requirement because a number of you had questions about that to my friend, Mr. Branson. And I think that while Judge Leon did not rest on that ground, Mr. Branson acknowledged that that's a pure legal issue that I think this court could comfortably resolve. And our fundamental submission on this is fairly straightforward. The definition of act of international terrorism is really meant to differentiate between conduct that can constitute primary or direct liability and conduct that can constitute secondary or aiding and abetting liability. And an act of international terrorism under section 2331.1 has to satisfy two requirements. First, it has to be a violent or dangerous act. And second, it has to be an act that an objective observer would conclude was intended to intimidate or coerce a civilian population. There are other potential intents, but that's really the relevant one here. And I think with regard to these sorts of claims of providing effectively material support, that these are at most fits for secondary liability and not primary liability. And the case on which Mr. Branson primarily relied today, as he does in his brief, from the contrary view is the Seventh Circuit's decision in Boyle. And I think that opinion is frankly a somewhat confusing opinion. And I think it's fair to say that the court in that case seemed to really be straining to find a way of characterizing the conduct as primary liability because aiding and abetting liability was not yet available. But as the Seventh Circuit in Judge Wood's very lucid opinion in Kemper explained, that was a case in which the defendant was making a direct donation to a known terrorist organization. And that's obviously not the case here. And I think with regard to the objective intent requirement, all I would say is that the only thing that the complaint alleges is that the supplier defendants had a commercial motive, namely to grow their market share in Iraq. And I would once again point to Judge Wood's very thoughtful opinion in the Kemper case, which held that very similar allegations were insufficient. But a commercial, again, like, I mean, just thinking about, you know, the logic of these tort doctrines, like independent intermediary, it seems to me that one can concede that there may be some independence or some non-terroristic functions going on at the Ministry of Health. And it might even be the intent of these defendants, you know, the dearest wish that whatever they're doing stays within that lane. But you know, if there's a huge amount of terrorism also being sponsored out of that building with that staff, you know, is the independent intermediary doctrine really applicable? That's one question. And then parallel with the commercial motive, sure, of course, you know, these entities, these defendant entities are businesses, and they can say, look, we just want to do business. But again, is that a block against liability? Is that a defense, if they're willing to exercise the commercial motive in a way that is knowingly providing support to terrorist organizations? And, you know, clearly not. So the recognition that there may be a that, you know, that even the plaintiff's complaint seems to acknowledge, I guess the question is just legally, can we at the complaint stage, categorically kind of lean on that? Or to what extent can we and why? So I think with regard to the active international terrorism requirement, and Judge Pillard, I think we're really talking now about the second component of that the objective intent requirement. Are you talking about appears to be? Yes, that is to say the requirement that the act be one that in the language of 2331.1 appears to be intended, and I'm ellipsizing some language to intimidate or coerce a civilian population. I think that that is something that the court can determine, as a matter of law, as again, I think Mr. Branson acknowledged. And I think here, our submission is quite straightforward, which is that transacting with the ministry is not an act that is intended to intimidate or coerce the civilian population, and not one that an objective observer would think was intended to have that effect. And again, you have to satisfy both requirements to have an active international terrorism. And the act here simply was not an act that is violent or dangerous to human life. And that's why I think aiding and abetting liability would ordinarily be a more natural fit if the plaintiffs could satisfy the requirements for that. The only other thing I would say on primary liability before we move to aiding and abetting liability is that I think with regard to the causation analysis, the manufacturer defendants do stand at a further causal step removed from the supplier defendants. And there simply are not allegations in the complaint, non-conclusory allegations in the complaint to support the notion that the supplier defendants were acting as the agent for the manufacturer defendants. And so I think at a minimum, if this court were to disagree on primary liability, it should at least make that clear and make clear that the manufacturer defendants were- Do you have a view of what source of law applies? I mean, it seems just in common sense parlance, it seems pretty clear that if you're a manufacturer and you want to sell to a market, you work with a supplier to send your stuff there. I mean, it doesn't have to be day-to-day control in every aspect. We're not talking about a general agency to act in all respects. We're talking about the manufacturer getting these specific goods to these specific customers. Is there really any question that the suppliers are their agents for that purpose? I don't think I would disagree with Mr. Branson's suggestion that this is governed by restatement type principles. My point is simply that the complaint, again, and we set this out in our brief, doesn't really contain any non-conclusory allegations of that. And there's about proximate causation here. So there's undoubtedly a further causal step that would have to be satisfied as to those defendants. I do want to turn- You were going on. Yeah, go ahead. You were going on. I do want to turn to aiding and abetting liability because while I said a second ago that I think that that would otherwise be a natural fit if the requirements can be satisfied. Of course, our fundamental submission is that there are two basic requirements that haven't been satisfied here. First, the substantial assistance requirement. And second, the general knowledge requirement. As to substantial assistance, we believe that Judge Leon correctly applied the Halberstam factors, which were of course incorporated into the ATA under JASTA. I want to try to simplify the analysis here because I think whenever a court has a multi-factor test like this, it can turn into a morass fairly quickly. I think I would try to categorize the factors here into three. The first is the nature of the act and the kind of assistance. The second is the presence of defendants and defendants' relationship with the perpetrators. And the third is really the defendant's state of mind. I think with regard to the kind of assistance, plaintiffs really try to run from the language that this court used in Halberstam. But the court repeatedly referred to whether the injurious act was heavily dependent on the alleged assistance, whether the assistance was essential or important to the illegal activities. Clearly, that was true in Halberstam itself. There's no question that Hamilton played an essential role in the overall criminal enterprise. But here, there is no, but the whole point, of course, is that that is not required as a matter of secondary viability. And this court, I think, correctly drew on principles from the aiding and abetting and the conspiracy context to say that you don't have to play a role in every single act of the criminal enterprise. Whereas here, you know, there is an obvious mismatch between defendants' transactions and the Mahdi Army's terrorist acts. And the complaint really doesn't allege that defendants' transactions intensified the terrorist campaign. Indeed, the complaint itself alleges that Iran supplied the Mahdi Army with its weapons. And so, you know, again, I'm willing to acknowledge that the plaintiffs don't have to show that the terrorist activities would not have taken place absent the assistance. My point is simply that this court has said that the conduct has to be important, essential, that the injurious acts have to be dependent on that assistance, and plaintiffs can't meet that requirement here. I think with regard to the second category of factors, the presence of defendants and defendants' relationship with the perpetrators, I think plaintiffs all but concede that those factors favor the defendants. And that brings us to the defendant's state of mind. And I think here, once again, the plaintiffs are really struggling with the language that this court used in Halberstam. This court said that the defendants have to be one in spirit with the perpetrators. And while plaintiffs, I think, try to sort of file that down to a very generic knowledge requirement, that is language that courts in engaging in the substantial assistance analysis have routinely relied upon. And there's obviously no dispute here that defendants did not share the Mahdi Army's intention of harming American service members. Now, we think that the complaint fails plausibly to allege even knowledge, and I'll get to that in a minute. But I think for purposes of the substantial assistance analysis, this court in Halberstam was really, I think, drawing on principles in other contexts such as conspiracy to say that the real question is, does the defendant share the aims of the enterprise? And in applying that requirement in the Halberstam case, the court concluded that the defendant Hamilton's knowledge, quote, evidences a deliberate long-term intention to participate in an ongoing illicit enterprise. And so Judge Pillard, while Hamilton may not have specifically intended that the murder be committed, the court nevertheless found that that factor weighed in favor of a conclusion that there was substantial assistance. But even in a criminal case where a defendant is subject to aiding and abetting liability, let's suppose aiding and abetting first-degree murder, the government, the prosecution doesn't have to prove if I hand a knife to someone and then that deliberation, the same intent required of the principle. It's something less that the government is required to prove. And so saying the kind of one in spirit language in Halberstam, I mean, we can't take that too far, right? I think that's a fair point, Judge Wilkins. And I don't think I would disagree with something that the plaintiffs said in their brief, and I believe in their reply brief, which is that this is something of a sliding scale. This is, after all, a multi-factor inquiry. I just don't think that it's a one-way ratchet. In other words, I think that the absence of a shared intent here is significant. That's a point that other courts have, I think, attached significance to in engaging in the substantial assistance inquiry. It certainly isn't dispositive. And of course, our submission is that to the extent that knowledge is sufficient to meet the independent state of mind requirement, that the allegations here fall short of the required level of knowledge. And I'm happy to turn to that because I do think that- Yeah. I mean, that might be helpful. My question when you were characterizing Halberstam is it just seems that you're going to have situations in which you have corporate defendants, which frankly are really in it for the buck. So they're not a deliberate long-term intention like the domestic partner of a criminal. No, it's not really a perfect fit. But the fact that they're really in it for the buck doesn't get them off the hook where they're willing to go after that buck in a way that really is heedless to an ongoing, I mean, as alleged by these plaintiffs, an ongoing, obvious, open, violent campaign of terrorism. It's like, you know, not our problem. And then sending along the support. And so I guess if that were proved, and I know that your position is that these allegations don't rise to the level of even the way Mr. Branson would characterize them. But if you did have a case that presented a corporation in that position, you wouldn't be limited by Halberstam in the way you just described, would you? If you had allegations that rose to that level, Judge Pillard, and I really don't think that the allegations in this complaint rise to that level. But if you did, it would obviously be for defendant in those circumstances to make an argument that the requisite state of mind didn't exist. But let's go right to the state of mind requirement, because I do think that that provides an independent way of disposing of the aiding and abetting claims here. Now, first, what is that requirement? In our view, the proper understanding of that requirement is that a defendant has to be aware that it was playing a role in terrorist activities. Where we get that from? We get that from the language of Halberstam itself, which says that a defendant must be, quote, generally aware of his role as part of an overall illegal or tortious activity at the time he provides the assistance. Now, I think the proper understanding here is that the relevant activity, the relevant illegal activity is the terrorist activity. Now, my friend, Mr. Branson, relies on some language from the Second Circuit's recent opinion in Kaplan, where the Second Circuit slightly modifies that and says that the defendant may be liable if it was, quote, generally aware of its role in an overall illegal activity from which an act of international terrorism was a foreseeable risk. Now, I think that that's probably a somewhat imprecise gloss on the relevant statutory language. I really do think that the illegal activity is the terrorist activity. It certainly has to be the activity of the alleged perpetrator. But even if you accept that gloss, we think that that requirement is still simply not satisfied here. And I want to go directly to the sources on which plaintiffs rely for the alleged knowledge. Now, I think at bottom, plaintiffs are really relying on three things. They're relying on press reports, they're relying on visual cues, and they are relying, once again, on the allegations of corruption. Now, with regard to the press reports, we address these at some length in our brief at pages 54 to 55. Our fundamental submission is that there were no allegations of diversion of resources in the public domain at all until 2007, when the Deputy Ministry of Health was arrested. And I think the fair inference from the press reports was that the government was dealing with the issue of militia influence. But our submission is that these sorts of press reports are simply not sufficient to get to general awareness of the role in terrorist activities. And I would point this court to two Second Circuit opinions, the Siegel case and the Honickman case, for the proposition that these sorts of press reports in and of themselves are not enough. Now, and I would note parenthetically that to the extent that Mr. Branson today relied primarily on a U.S. embassy report to this proposition, this is at joint appendix, I believe, 123, that that report isn't really helpful for scienter purposes, because they're citing an internal U.S. government document that doesn't even appear to be available publicly. It's marked sensitive, but unclassified. Leaving that aside, let's get next to the visual cues. And I think on the visual cues, our submission is that even if the complaint alleged that defendants' own employees actually visited the ministry, and the most of the complaint alleges is that some scientific bureaus that were allegedly agents of the defendants visited the ministry, but even if they did visit the ministry, and even if they did see these posters, that that would not be enough to put defendants on notice that the Mahdi Army was stealing and selling medical goods and using the proceeds to finance terrorist attacks, once again, particularly given that this was a time period during which the United States government was providing support. And to the extent that there are, you know, allegations that there was a room with AK-47s in it, there's no room during the relevant time period. And so again, our submission is that these allegations of state of mind are weaker than those in other cases where the court has said that state of mind is insufficient. In the Siegel case, the defendant bank was aware of public reports of an organization linked to terrorists, and indeed, the bank itself was committing sanctions violations. The court still said that that was insufficient to satisfy the general awareness requirement. Again, to the extent that plaintiffs point to the allegations of corruption more generally, you know, the most that could be said is that that would suggest, and I don't think it sufficiently does, but even if it were, the most that it would do is to suggest that defendants were aware of corrupt practices at the ministry, and not that defendants were aware that they were playing a role in terrorist activities. So I think that to the extent that the court has any concern about affirming on the ground that there was not substantial assistance here, and I do think Judge Leon's analysis of that was correct, the court can affirm on the ground that the state of mind requirement here was not satisfied. Why do you think on the aiding and abetting that this case can be properly, assuming we're bound, can be properly distinguished from Kaplan? Kaplan distinguishes Siegel, so I'm not persuaded that your analysis of Siegel is in any way dispositive. Kaplan is a very strong statement against your position. You and those on that side of this world cheered by the Second Circuit decisions before Kaplan. Judge Kears really whacked you away on a lot of these questions on aiding and abetting. How can you distinguish? If I'm persuaded that Kaplan's right at this point, what would your response to me be? I think I would respectfully say, Judge Edwards, that this case is more like the cases that preceded and followed it, Siegel and Honickman, and less like Kaplan, and that is because in Kaplan, you know, the party with whom the defendant was transacting was, you know, persons who were known to be, in the words of the court, integral parts of Hezbollah, and who were so closely intertwined with Hezbollah's violent activities that one could reasonably infer that the bank had general awareness. And again, as we discussed earlier in the argument, I don't think that the allegations here rise to that level. And so we don't dispute that Kaplan came out correctly. Our view is simply that this case is more like the cases where courts have said that allegations are insufficient. Mr. Shemigan, I mean, you know that, and this is a very, very tough issue for courts, because of the, you know, the tremendous burden of discovery. But, you know, when there are allegations of state of mind, pretty hard to be, you know, super definitive at the pleading stage about what your opposing parties knew, what kind of due diligence they did, what they uncovered when they did that due diligence, to what extent they were actually acting reasonably and really unaware, or to what extent they were on notice and putting their heads in the sand. And so, you know, and I, as I said, I recognize that these are very difficult and, frankly, issues that are hard to resolve in a satisfactory way, because of the implications of opening the door to that kind of inquiry. But if the law is making state of mind relevant, consistent with the law, you think we can nonetheless demand more at the pleading stage? I don't think we're asking you to demand anything more, Judge Pillard, but as I think your question reflected, courts have not hesitated to dismiss these cases at the motion to dismiss stage, including on the issue of knowledge with regard to aiding and abetting claims. And indeed, the Siegel case and the Honickman case are both examples of that. And if a court applying the plausibility standard concludes that the plaintiff's allegations are insufficient, I do think that that is the right thing to do, particularly given the burdens of this type of litigation and the potential for really challenging discovery. But the only other thing I would note with regard to state of mind here generally is that I think the issue of state of mind here has to be read against the backdrop that makes this case so fundamentally different from all of the other cases that we've been discussing. Namely, that during this time period, the United States government, far from labeling the Iraqi Ministry of Health somehow problematic or the equivalent of a state sponsor of terrorism, far from labeling Jaysh al-Mahdi as a foreign terrorist organization, was providing support for the Iraqi Ministry of Health and indeed encouraging defendants to do so. You started your argument, Mr. Shanmugam, saying that these defendants answered the call of the United States. They stepped forward at the request of the United States government. And your citation for that, I'm sure it's in the introduction to your brief, but you're relying for that on what? On government reports, of which I think that this court can take judicial notice. And I would point the court to page 31 of our brief, where we point out that the United States government encouraged companies to supply the ministry and even contracted with some of the defendants to supply medical equipment for ministry facilities, citing a report from the Special Inspector General for Iraq Reconstruction. And again, I think that that is comfortably in the category of things of which the court can take judicial notice. Maybe so. I'm sorry, I didn't mean to interrupt you. Not least because... Not least because this court has repeatedly said that it is settled that the court can take judicial notice of records that reflect the United States government's official position. And that's all that we're asking the court to do, I think, consistent with the familiar standard from Rule 201. And I think that that's a really pretty modest proposition for the court to take judicial notice of. And I would note that to the extent that the plaintiffs seek to supplement their third amended complaint in this case with amicus briefs to try to sort of cast doubt on the nature of the United States government's support, I think the amicus brief on which they rely stands at most for the proposition that some within the United States government were concerned with corruption at the time as they were before, during, and after the relevant time period. And for purposes of the state of mind requirements, again, the question is, did defendants know that by transacting with the ministry that they were potentially supporting terrorist attacks on American service members? And leaving aside the obvious implausibility that these defendants would want to do anything to endanger the lives of American service members, an allegation that is obviously deeply upsetting to these defendants. The fact remains that that is the touchstone of the inquiry here for purposes of aiding and abetting liability, as it is for purposes of primary liability with regard to the objective intent requirement we were discussing earlier. I know that the time is- I just want to add one thing. Both Kaplan and Gonzalez rely on news reports for general awareness. So, I mean, I don't think you can sweep them away as quickly as you're doing. They clearly are making fine uses. So, you may disagree with them, but they certainly have adopted an approach. And you're right, the earlier cases were very grudging, but Congress has amended in willingness to find liability, but Congress has amended the statute and has tried to give very strong statements as to what their intended purpose is, purpose of Congress is sweeping. But one other thing, I'm just curious on this government support. It's an interesting argument. Are you saying these are mutually exclusive notions, that is, the existence of government support and the support of terrorists? If you can find the existence of government support, you cannot find support of terrorists? I mean, because you're trying to get away with too much. No, I'm not trying to get away with- I don't mean that in a bad, there's no bad intent, but I mean, given the world in which we're living in now, I mean, I think you and I could agree over cocktails, of course, there's situations where the United States is probably supporting a piece of this. And there were parts of the ministry that were perfectly okay in what they were doing. And there's a part of that group, the ministry and those with whom they're hanging out are doing bad things. And so you can have both U.S. support and you can have support of terrorism, right? So I would say three things in response to that. First, Judge Edwards, I am not trying to argue for that sort of a bright line rule. My view is simply that the United States government support is relevant to the analysis. Second, I take your point that plaintiffs now have two cases at the court of appeals level that have found allegations of knowledge to be sufficient, the Kaplan case and the Gonzalez case, which found allegations in part to be sufficient. But the allegations there were much more substantial. And in the Gonzalez case, with regard to the part of the claim that the court allowed to proceed against the social media companies, the court cited the fact that, quote, defendants allowed ISIS accounts and content to remain public even after receiving complaints about ISIS's use of their platform. So again, I think that the allegations there were more substantial. And my third point, and then I do turn briefly to Hezbollah and personal jurisdiction, and I know that we've gone over time. But my third point, Judge Edwards, is that this brings us back in some sense to where I started, which is really the concern with permitting broad liability in contexts like this, where you have the United States government encouraging defendants to do business. If you permit liability under these circumstances, it is going to chill companies and non-governmental organizations from doing business in precisely the sort of troubled reasons that you were alluding to. If we were discussing this issue over your cocktail, we might be talking about what's going on right now in Afghanistan. You're going to have similar problems in other troubled areas of the world where parties are going to be concerned about potential liability for transacting with government entities. And that does actually bring us to the issue of Hezbollah, because the reason that there is a foreign terrorist organization requirement here is, I suspect, in part to provide some degree of clarity as to who you can deal with and who you can't deal with. And so while the foreign terrorist organization argument would not dispose of the at least some attacks as to which the complaint alleges some degree of involvement by Hezbollah, it simply can't be enough simply to inspire a non-FTO perpetrator or to train its fighters or even to provide a weapon. If I say to you that it's a good idea to get married, no one would say that I was planning your wedding. Even if I provided the ring to you, I don't think I could be said to have planned or authorized your wedding. And Judge Wilkins' example involving a brief is exactly right. While we would acknowledge that you could plan a campaign, you could plan a series of acts, there has to be a greater degree of involvement than simply inspiration or providing weapons. Maybe planning a wedding is more complicated than planning the detonation of a penetrative missile. Well, that may very well be true, but the mere provision of the missile is insufficient. And one thing we know is that Congress didn't use terms like material support. It required planning or authorization. And I think that that tends to confirm that mere supply is not enough. Now, I do want to turn, because I know we're well over time, just to personal jurisdiction in the last couple of minutes here, because I do think that should this court disagree with us on the merits here, that at a minimum, Judge Leon's dismissal on personal jurisdiction grounds was sufficient. Mr. Branton is certainly correct that the Supreme Court's decision in the Ford case makes clear that a causal connection is not required. But even in the wake of Ford, our fundamental submission is that there is an insufficient nexus between plaintiff's claims and the presence of United States manufacturer defendants in the foreign defendants' supply chain. Now, plaintiffs have considerably narrowed their theory of personal jurisdiction on appeal. They're relying only on the allegation that the foreign defendants sourced from the United States some of the medical goods that they supplied to the ministry. But I think Judge Leon correctly determined that those forum contacts are incidental to plaintiffs' claims. The foreign defendants' liability here was rooted in their alleged misconduct in Iraq. It was not rooted in the sourcing of goods from the United States. Now, Mr. Branton suggested that Judge Leon got the legal standard wrong. I would encourage the court to look at the page that he cited. It's Joint Appendix, page 818, or page 11 of Judge Leon's slip opinion. He does note that the plaintiffs do not allege that the foreign defendants' manufacturing or sourcing practices were themselves unlawful or could otherwise subject the foreign defendants to liability under the ATA, or that otherwise that would be sufficient to establish personal jurisdiction. But then he goes on in the next sentence. He doesn't stop there, and he says, nor do those practices constitute the suit-related conduct underlying plaintiffs' ATA claims. And that's the fundamental problem here. At bottom, plaintiffs are really relying on a single allegation. It's the allegation in paragraph 153 of the complaint at Joint Appendix 158. It is incorporated earlier, I think, in paragraph 121. But it's the allegation that the soderists, quote, placed a premium on importing medical goods manufactured in the United States and Europe, noting that other goods were more likely to be counterfeits. That is simply not enough. And this case is a far cry from a case like the Leachy case, on which plaintiffs rely in their reply brief from the Second Circuit, where, you know, a U.S. bank account is really being used as the instrumentality of the relevant misconduct. And so we think that the mere fact that some of the goods were sourced in the United States is insufficient, and we don't think the jurisdictional discovery would affect the analysis, because the question It almost sounds like, Mr. Shemmigan, you're going back to the causal test, because here, there's no question that they were, in fact, sourcing vast quantities of goods from the U.S. And so it sounds like you're saying, well, their U.S.ness has to somehow be, you know, their character as American goods, which, you know, granted, the plaintiffs have, as you say, also allege that. But putting that aside, does it matter for personal jurisdiction, or is it required for personal jurisdiction that the American trade dress of these products be relevant to the terrorism allegations? Or is it enough that the suppliers are sourcing all of this stuff from the U.S.? So the question is, is there a tight enough relationship between the suit-related context, and here the U.S.-related context, and plaintiffs' claims? Yeah. And our view is that even if you don't think about it in terms of causation, that the mere presence of U.S. goods in the supply chain is insufficient, there's no dispute. It's not mere presence. They're buying, they're taking U.S. goods and selling them in huge quantities. I mean, they are the instrument of this support for terrorism allegation. These are American goods. These are companies that are, the suppliers are, you know, benefiting in the selling of these goods in Iraq. They're benefiting from the protection of U.S. contract law, from the protection of U.S. food and drug law, from the protection of U.S. intellectual property law. And all of these, you know, that's how they make their business, is that they're selling U.S. goods in other countries. And so I guess I'm missing why the potential, you know, the questions that you raise about the terrorists particularly liking American goods, like, put that aside. Is there a question about personal jurisdiction, even if we didn't have those allegations? Well, I think what we know, I think we can't say, you know, how much of these goods were that on this record, we don't know the answer to that question. What we do know is that many of the contracts did specify other countries as the source of origin for the contracted goods. But our submission is that I think for legal purposes, that that doesn't matter. You know, in other words, that the exact quantification, which seems to be what Mr. Branson would want from jurisdictional discovery, wouldn't somehow establish a tighter nexus between the United States and plaintiff's actual claims here, which again, do not depend in any way on the fact, as a legal matter, on the fact that the goods are being sourced from the United States. And so again, I think at a minimum, it is not the case that Judge Leon adopted a legal test that turns on the unlawfulness of the United States conduct. And because he applied the correct legal test, we believe that he in fact reached the correct result, and that that is true even in the wake of the Supreme Court's decision. Unless the court has any further questions, I think I would just sort of close where I began. And it goes without saying that the defendants here condemn the attacks on U.S. service members in Iraq and sympathize with the plaintiff's plight here with their desire to hold someone accountable for the injuries that they and their loved ones have suffered. But as Judge Wood said in her opinion for the Seventh Circuit in Kemper, this is a case in which my clients are simply the wrong defendants, and there's no valid legal theory on which they can be held liable, either as a matter of direct liability or aiding and abetting liability under the ATA. And unless the court has any further questions, we believe that the district court correctly dismissed those claims and that its judgment should be affirmed. Thank you. Mr. Branson, if you would like it, you can have, given the length and the complexity of the issues, you can have four minutes for rebuttal. You're on mute. Thank you, Judge Pillard. And Judge Edwards, I'd like to start with your question. You are exactly right about Kaplan. Judge Kearse rejected virtually every legal argument that my friends have made on aiding and abetting liability. And Mr. Shane McGann attempted to distinguish it by saying that the intermediaries there were integral parts of HESBLA. That's their argument. That was plaintiff's characterization in the complaint, sourced primarily to anonymous, undated websites. That is why the Second Circuit accepted that characterization. And I think all this court needs to do is compare paragraph 78 to 79 of the Kaplan complaint, which were the basis of that with paragraphs 165 to 187 of our complaint. It's no contest who has more detailed allegations to draw the inferences that Judge Kearse properly drew in Kaplan. And I would just note that the lead intermediary in Kaplan was the Shaheed Foundation. The defendants argued vehemently, just like Mr. Shane McGann just did, that that was a medical institution that built hospitals and provided medical services to orphans. That's what the defendants said in their brief. But the Second Circuit accepted the allegations in the complaint because it's a motion to dismiss. And if this court does that here, the logic of Kaplan, which I think is very persuasive, dictates a reversal. Mr. Shane McGann also said repeatedly that the U.S. government encouraged them to do these transactions. There is not a shred of evidence in the joint appendix that says that. I'm happy to walk through every document that they've cited. I've read every multiple times. There's no evidence of that. But the best Mr. Shane McGann has is this vague spreadsheet from a Special Inspector General for Iraq Reconstruction Report at JA, I believe, 691 to 96. Those are talking about direct U.S. government contracts where the U.S. ran the procurement and then supervised the installation of the goods and the services as part of its effort to rebuild Iraq's health infrastructure. And their own lead advocates, in an interview given to the Special Inspector General for Iraq Reconstruction, acknowledged the difference between the two. So this idea that the U.S. government asked the defendants to sell to Kamadia, it's not true, and there's no evidence of it. And that's even assuming the court should take judicial notice of these reports, which I don't think it should. I mean, most of them are these anonymous weekly reconstruction update documents that I've been unable to authenticate. We've served FOIA requests on USAID to find them. USAID can't find them. The defendants downloaded them from some third-party website. For all I know, they were written by an intern in USAID and never made public. So the idea that in a case of this magnitude, the court should find what official U.S. policy in Iraq was based on anonymous newsletters that that's not what this court should do. By contrast, here are the facts about the U.S. government in Iraq. By 2007, U.S. officials could not even go into the ministry building because it was too dangerous and they were getting death threats. That's paragraph 180 of the complaint. We've spoken about the military operation to arrest and prosecute Hakem Zamali, who was, these defendants, essentially their counterparty and one of the worst terrorists in Iraq. That's paragraph... I hate to interrupt when you have limited time and you're clearly trying to use it efficiently, but when you talk about the agents of the defendants or the defendants, it's a little bit unclear in the pleading, going into the building, as you've said, Americans couldn't go in. I assume that you're talking about the scientific bureau. Is there any reason to think that it's a scientific bureau who I understand to be local Iraqi people that are working on behalf of the defendant companies? Any reason to think that they would communicate back how many AK-47s they found leaning against the wall or whether they found Death to America posters on the wall or anything like that? Yes. I mean, the scientific bureaus were their local agents in Iraq responsible for these businesses' relationship with the ministry. So yes, there is an entirely plausible reason that they would have reported it back. But I would also note, Judge Tillard, we've alleged that they were agents. That's paragraph 158 of the complaint. And so an agency relationship, the knowledge is imputed to the principal. So even if there was not a communication back to the companies themselves, and to be clear, we're entitled to discovery on that. That is not an inference this court should resolve on a motion to dismiss. But we don't think we need that because as a matter of fundamental agency law, the knowledge was imputed. And I would just stress that for all of Mr. Shamagam's discussion about knowledge, Judge Leon went as far as to say there was knowledge at JA 835. I quoted that in my opening brief. He said that the defendants, quote, were aware that their goods, quote, would be used by Jay Shalmati to support terrorist attacks, as alleged, of course. And so this knowledge issue, again, I think Judge Edwards had it right. I mean, you compare the knowledge allegations here to the ones in Kaplan, and I think the case needs to be reversed. On Hezbollah, just very briefly, Mr. Shamagam, it characterized our allegations as merely providing the weapon, or merely giving inspiration. That's not what we allege. Yes, they did provide the weapon, but they did a lot more than that. They trained them how to use the weapons. They had operatives on the ground dictating day-to-day tactical decisions about how to use them. They encouraged Jay Shalmati to use these weapons against Americans in Iraq. And that is why I think the easiest way to see this is at paragraphs 395 to 96 of the complaint talking about these explosively formed penetrators. The idea that all Hezbollah did was give them the weapons and nothing else, that is not what we allege. And at a minimum, you know, Judge Wilkins, I know that you had some questions about how to draw the line on this, and I acknowledge that there are going to be hard cases at the margins. I would encourage the court, if it's concerned about that, to draw those sorts of lines on a summary judgment record when the factual record has been fully developed. Because I think no matter what the legal test is, and I would note that my friend didn't actually articulate what he thinks the test is. I'm surmising he thinks that it means that a Hezbollah person has to show up to the street corner and point, blow up this bomb and kill that tank. If that's the test, and I don't think it is, we're entitled to discovery because we have at least alleged a plausible nexus between what Hezbollah did and each individual attack, such that discovery may well yield the sort of evidence that I think my friend is demanding. I'm going to let you go. What are the best responses to the concerns that many have voiced in the opinions and in the argument today about casting a net so wide that entities or individuals that really want to provide humanitarian aid to people in distress, of which there are many in areas that are under terrorist control or besieged by terrorists, that they would be snared in this law? Well, Judge Pillard, it depends on what the facts are, of course. I think if all, I'm thinking of the charities amicus brief that the other side submitted. If all you're doing is providing humanitarian assistance in an area that has terrorists in it, that's not going to be enough to create liability. I mean, the statute, I think my friend quite rightly said, has two key elements. You need substantial assistance and you need awareness. And those are not easy bars to meet. I think they're met here by the complaint, but it's not as though every charity in the world is going to be subjected to a lawsuit like that. And I think there's been no showing that there would be. To create an action under this statute, you have to substantially assist terrorists that are attacking Americans. And I guess, Congress really doesn't like it when companies fund terrorists. And so, there may well be some competing policy considerations that might rear their head in some future case. But very heavy in the calculus is Congress's determination that you shouldn't fund terrorists. And when you do, that is an extraordinary interest that Congress was entitled to legislate against. And I think when you apply this statute to these facts, the case should be reversed. Thank you, counsel, both of you for a very able argument in a very difficult, not just legally, but in other words, very difficult case. Case is submitted.
judges: Pillard, Wilkins, Edwards